UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Terina Allen,

       Plaintiff,

v.

                                 Case No. 2:05-CV-00707
                                 JUDGE SMITH
                                 Magistrate Judge King

Ohio Department of Job
and Family Services,

       Defendant.

## OPINION AND ORDER

    Plaintiff Terina Allen ("Plaintiff") brings this employment action against Defendant the Ohio Department of Job and Family Services ("Defendant" or "ODJFS"). Plaintiff asserts she was subjected to sexual harassment and retaliated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e). Defendant has moved for summary judgment with respect to all claims (Doc. 17). For the reasons that follow, the Court **GRANTS** Defendant ODJFS's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

    Plaintiff Terina Allen is a 36 year-old female who was employed with Defendant ODJFS as an Employment Services Coordinator in the Office of Development from approximately April 2003 until February 2005.[1]

---

[1]Plaintiff's last day of work was February 16, 2005; her formal resignation was on August 23, 2005. (Allen Depo. at 25).

The Office of Workforce Development, a division of ODJFS, is divided into Bureaus which are further divided into sections and then units.  Plaintiff worked in the Bureau of Support Services, Grants & Audit Resolution Unit where she assisted in the allocation of federal dollars to Ohio counties.  Plaintiff's job was one of two non-managerial, collective bargaining positions in the Unit; the other position remained vacant throughout Plaintiff's employment with ODJFS.  Plaintiff's duties consisted of (1) providing technical support in grants and audits to surrounding counties; (2) conducting audit and compliance functions; (3) preparing audit reports and work papers; and (4) coordinating conferences and other activities with outside entities.  Plaintiff testified that she spent approximately thirty to forty percent of her time performing these duties and the remainder of her time working on special projects for supervisors and Bureau chiefs.

The Office of Workforce Development is headed by Deputy Director William Demidovich, who was appointed to that position in November 2004.  Mr. Mark Birnbrich is the Assistant Deputy Director of the Office of Workforce Development.  Mr. Birnbrich held this position during Allen's tenure at ODJFS.  Steve Clayborn, a Management Analyst Supervisor 2, was Plaintiff's immediate supervisor.  Thomas Hutter is the Bureau Chief of Workforce Development and has been Mr. Clayborn's immediate supervisor since 2004.  Mr. Hutter has been employed with ODJFS since 1992.  As Chief, Mr. Hutter was responsible for daily operations of three sections, including Plaintiff's unit.  Mr. Hutter is the only ODJFS employee that Plaintiff claims acted in a sexually harassing manner.  Plaintiff and all of the managers in her chain of command, Messrs. Demidovich, Birnbrich, Hutter, and Clayborn, were located on the same floor of an office building, and all had offices in close physical proximity of each other.

**A.      Alleged Sexual Harassment**

2

Plaintiff alleges the harassment began when Plaintiff was requested to accompany Mr. Hutter on various out-of-town business trips.  The first car trip occurred on January 20, 2004. Plaintiff testified that there was "normal conversation," and that there was nothing offensive about that trip. (Allen Depo. at 46-49).  Plaintiff alleges that during their second trip in February 2004, Mr. Hutter asked her personal questions such as whether she was happily married. (Allen Depo. at 50-51).  Mr. Hutter told her that he was happily married, but that he had previously had an affair. (Allen Depo. at 50-52).  He also asked her what she thought about having an affair. (Allen Depo. at 56).  Mr. Hutter made comments such as "I want to be your friend" and "having me as a friend will get you places." Plaintiff told Mr. Hutter that she did not need a friend. (Allen Depo. at 74-75; 77).  Mr. Hutter apologized for his comments, and Plaintiff believed he was sincere.  Plaintiff also alleges that Mr. Hutter accidentally "grazed" her thigh with his arm when reaching for something.  (Allen Depo. at 53-56). Plaintiff testified that Mr. Hutter's conversation and actions made her feel uncomfortable. (Allen Depo. at 56-57).

During their third car trip, in March 2004, Plaintiff alleges that Mr. Hutter implied that she could advance her career by having sex with him by putting his hand on her thigh and asking her "aren't you interested in making your career the best it can be?" (Allen Depo. at 83-88). Plaintiff claims that Mr. Hutter was "profusely apologetic" once she expressed that she was not interested in a personal relationship. (Allen Depo. at 88-89).

During their fourth and final car trip, Plaintiff testified that Mr. Hutter asked her for a kiss and told her he was not driving unless Plaintiff gave him a kiss. (Allen Depo. at 93-96). Plaintiff declined and Mr. Hutter leaned up against the window and "drove off eventually." (Allen Depo. at 94).  Again, Mr. Hutter "profusely apologized." (Allen Depo. at 101). Plaintiff testified that she did not believe her job was in jeopardy because she rejected Mr. Hutter's

advancements. (Allen Depo. at 106).

Plaintiff did not report Mr. Hutter's behavior to anyone. (Allen Depo. at 104-105). Plaintiff explains "I don't know what he would have been doing wrong.  Even today, I still don't know that at that moment he would have been in violation of something. Other than coming on to a woman." (Allen Depo. at 106).  Plaintiff did, however, tell Mr. Clayborn that she did not want to go on trips with Mr. Hutter because she was not "comfortable." (Allen Depo. at 110). She gave no explanation or details even when Clayborn inquired, but instead said that she "didn't want to talk about it." *Id*.  Mr. Clayborn, after speaking with Plaintiff, did not suspect that Plaintiff was complaining about sexually inappropriate behavior. (Clayborn Depo. at 21).

Plaintiff testified that Mr. Hutter did not act inappropriately toward her in the office between the car rides. (Allen Depo. at 106).  After the March 2004 car trip, and until July 2004, Mr. Hutter committed no offensive or harassing acts and treated Plaintiff "appropriately." (Allen Depo. at 107-108).

Plaintiff testified that the sexual harassment by Mr. Hutter began again in July 2004. Plaintiff alleges the harassment took the form of stares, comments and physical contact, which culminated in a physical assault on February 1, 2005.  Plaintiff alleges that on one occasion, Mr. Hutter touched her breasts with his hand. (Allen Depo. at 119).  She testified, "as he was walking by to go to the bookcase, I'm standing at the door of his office, and he comes by to go - there's a book case right here, and he goes to get a book, his hand goes across my breasts.  It goes right across my breasts.  But it just, as he goes to get the book." *Id*.  Plaintiff states that he apologized. *Id*.  At that time, Plaintiff believed it must have been in accident because Mr. Hutter had not done anything for several months. (Allen Depo. at 119-120).

Mr. Hutter then began to make comments every couple of weeks such as "That shirt

4

looks really good on you" and "I really like the way you look in that outfit." (Allen Depo. at 113-114). These comments made Plaintiff feel uncomfortable. (Allen Depo. at 117). Also in July 2004, Plaintiff testified that Mr. Hutter would periodically touch her in the office. She states that Mr. Hutter would touch her to "scoot me over" or "it would just be him moving me." (Allen Depo. at 184-185). Plaintiff also testified that Mr. Hutter would "grab my hand and hold my hand. And which normally you'd think someone was just kind of like in a shake or, but he'd hold it a little too long." (Allen Depo. at 120-121).

Plaintiff further testified that on a couple of occasions, Mr. Hutter come into contact with her breasts as he would stand up, "A couple times, as he would - as I would go to sit, like he would say sit here in his chair at his desk, and he would go to get up, as he would get up, he'd touched my breast, you know, he'd rub up against me." (Allen Depo. at 183). On another occasion, Plaintiff was standing behind Mr. Hutter and when he got up, "his head touched [her] breast." (Allen Depo. at 184). Plaintiff believes this particular incident was a genuine accident. (Allen Depo. at 185).

Plaintiff testified that on three occasions between August 2004 and February 2005, Mr. Hutter approached her in the office and "patted" her buttocks. (Allen Depo. at 182). Specifically, Plaintiff states that she was leaning down to get some files when Mr. Hutter "just touched my butt, he just patted it." (Allen Depo. at 181). Mr. Hutter did not say anything to her when he touched her buttocks and Plaintiff did not complain about Mr. Hutter's misbehavior. (Allen Depo. at 181-182).

On February 1, 2005, Plaintiff testified that Mr. Hutter called her into his office. They had a conversation about Plaintiff transferring from her position and then Mr. Hutter asked Plaintiff to come over to his desk and assist him on the computer. Plaintiff was standing and Mr.

5

Hutter was sitting at his desk.  Plaintiff alleges that Mr. Hutter then stood up from his chair and said, "[H]ave you had enough?" (Allen Depo. at 203-204).  Plaintiff was shocked because they had just had a conversation about Plaintiff transferring from her position. *Id*.  Plaintiff states that she responded, "[E]nough? [E]nough of what, Tom?" *Id*.  Plaintiff alleges that Mr. Hutter next got up, put his hands on her arms, and pushed her backwards saying, "[H]ave you had enough?" (Allen Depo. at 204-205).  Plaintiff claims that Mr. Hutter then pushed her up against a wall, while touching her breast, waist, and buttocks and said she needed to "learn to comply and play his game" and that he could "make everything better . . . in a moment." (Allen Depo. at 206).  Plaintiff states that she said "no," pushed him away, and walked out of the office. *Id*.  Plaintiff claims that she went to the restroom, cried, and then returned to her desk and worked the remainder of the day. (Allen Depo. at 209-210).  Plaintiff did not report the alleged assault to anyone that day. (Allen Depo. at 211).  Plaintiff returned to work the next day, became ill, and took sick leave thereafter until February 16, 2005.

**B.     Alleged Retaliation**

Plaintiff, in a November 14, 2004 EEOC Complaint of race discrimination, cited a number of alleged retaliatory acts taken by Mr. Hutter and others, claiming they were discriminating against her for reporting instances of racial discrimination.  Defendant points out that now, however, Plaintiff claims that the conduct by Mr. Hutter was because she rebuffed his advances. (Def.'s Mot. for Summ. J. at 9).  Though this calls into question the credibility of Plaintiff's allegations, the Court, at this stage in the litigation, must refrain from making credibility determinations. (*See* discussion *infra* at II).

Specifically, Plaintiff claims Mr. Hutter refused to allow her to "flex" her schedule and twice denied her requests for overtime, telling her that she needed to leave work. (Allen Depo. at

162; 170-173).  Plaintiff also claims Mr. Hutter would "scrutinize" the time she worked. (Allen Depo. at 165-167).  Plaintiff further alleges that Mr. Hutter told her that he did not need her to travel to meetings that she believes she should have been able to attend. (Allen Depo. at 168-169).

Finally, in July 2004, she alleges that Mr. Hutter took her in a room threatened her with discipline if she made any more "complaints about anything that ever happened to you from all the way back to your first day of employment." (Allen Depo. at 126-127). Mr. Hutter then told her that Mr. Clayborn would be sending her an email. (Allen Depo. at 128-129).  Mr. Clayborn's email directed Plaintiff not to devote any more work time to writing incidents. (Allen Depo. at 127-128; Ex. 6).  Plaintiff also testified that, in another meeting, "Tom said, you cannot file on anything that happened all the way back to your first day of employment. If it happened after you were employed here, you have no rights.  I said, can I have union representative? He said, you cannot talk to anyone on work time." (Allen Depo. at 129).  Mr. Hutter's and Mr. Clayborn's instructions to Plaintiff not to file any more complaints occurred after she had filed numerous complaints against several coworkers and other supervisors for various other forms of harassment and retaliation.  On July 15, 2004, Plaintiff had a verbal altercation with another co-worker in the office.  Plaintiff was upset and began drafting a lengthy report/complaint about the incident. (Clayborn Depo. at 36).  Mr. Allen and Mr. Clayborn testified that due to the inordinate amount of work time Plaintiff used to draft her complaint, she was instructed to not utilize anymore work time to file complaints about incidents occurring in the past. (Clayborn Depo. at 38).

Plaintiff testified that after Mr. Hutter's and Mr. Clayborn's admonishments, she did continue to file complaints, but that she had to file from home. (Allen Depo. at 127).  For

example, on August 5, 2004, Plaintiff filed an unfair labor practice charge against Penny Purviance, Labor Relations Officer, and Marc Birnbrich alleging racial discrimination/ harassment, claiming that she was treated less fairly than Ms. Applegarth (Caucasian) in the resolution of their altercation. (Allen Depo. at Ex. 7).  On August 6, 2004, Plaintiff submitted a memorandum to Bruce Madison claiming that she was being retaliated against and harassed for filing the unfair labor practice charge on the previous day. (Allen Depo. at Ex. 11).  On October 24, 2004, Plaintiff filed an EEOC Complaint of racial discrimination over the coworker altercation and her perceived disparate treatment with the Caucasian employee. (Allen Depo. at Ex. 9). Finally, on November 15, 2004, Plaintiff submitted a lengthy report to the EEOC describing what she considered to be retaliation by Ms. Purviance, Mr. Birnbrich, and Mr. Hutter. (Allen Depo. at Ex. 10).  None of these complaints, however, concerned or mentioned the sexual harassment that was allegedly occurring at the same time these complaints were filed.

**C.    Report of Sexual Harassment.**

On February 16, 2005, the day Plaintiff returned to work, she verbally informed Mr. Clayborn that she had been assaulted by Mr. Hutter.  This was Plaintiff's first and only report of sexual harassment to anyone at ODJFS.  In fact, Plaintiff testified that she was "specifically trying not to tell people" that she was being sexually harassed. (Allen Depo. at 262).

Plaintiff claims that she did approach Bruce Madson, Deputy Director of the Office of Workforce Development before he was replaced by Bill Demidovich, and told him that she was "having issues with Tom," and asked for a transfer. (Allen Depo. at 191).  Plaintiff admits that she did not communicate the nature of her issues to Mr. Madison. (Allen Depo. at 191-192).

**D.    Reassignment and Resignation**

When Plaintiff returned on February 16, 2005, officials at ODJFS granted her prior

transfer requests and placed her in a lateral position as an Employment Services Coordinator administering SCOTI (Sharing Career Opportunities and Training Information). (Allen Depo. at Ex. 17).  This position carried the same salary, same benefits, was in the same classification and collective bargaining unit, was within the same division, and had similar job duties. (Allen Depo. at 239; Exs. 2 and 17).  Plaintiff had previously worked with the SCOTI staff and was familiar with those functions. (Allen Depo. at 19).  The new position was outside Mr. Hutter's line of supervision and was located on the fourth floor of ODJFS (two floors down).

Plaintiff alleges that her reassignment was in retaliation for her report of sexual harassment. (Compl. ¶ 43).  She claims that the new position was "undesirable" for the following reasons: (1) she wanted to be reassigned to a position located in another building (Allen Depo. at 248-249); (2) she was not interested in performing the new duties (Allen Depo. at 249); (3) the job responsibilities were not challenging enough (*Id.*); and (4) she was going to "lose out" on her friendships (Allen Depo. at 249-250).

Plaintiff did not return to work the next day. She states that the stress of having to work in the same building as Mr. Hutter would have made her unable to perform her job. (Pl.'s Memo. in Opp. at 7).  On August 2, 2005, Plaintiff resigned from her employment with ODJFS effective August 23, 2005.  (Allen Depo. at 268; Ex. 25).

On April 13, 2005, Plaintiff filed a Complaint with the OCRC and EEOC claiming that she was sexually harassed and retaliated against.  She did not check the continuing action box. On April 21, 2005, the EEOC dismissed Plaintiff's Complaint stating, "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statute." On July 21, 2005, Plaintiff filed the present action.

## II.  SUMMARY JUDGMENT STANDARD

9

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, Depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the non-moving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[2] The Court disregards all evidence favorable to the moving party that the

---

[2] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the non-moving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

jury would not be required to believe.  *Id.*  Stated otherwise, the Court must credit evidence

favoring the non-moving party as well as evidence favorable to the moving party that is

uncontroverted or unimpeached, if it comes from disinterested witnesses.  *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and

*Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new

era" in summary judgments.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989).

The court in *Street* identified a number of important principles applicable in new era summary

judgment practice.  For example, complex cases and cases involving state of mind issues are not

necessarily inappropriate for summary judgment.  *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the non-moving party

"cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed

fact, but must 'present affirmative evidence in order to defeat a properly supported motion for

summary judgment.'"  *Id., quoting Liberty Lobby*, 477 U.S. at 257.  The non-moving party must

adduce more than a scintilla of evidence to overcome the summary judgment motion.  *Id.*  It is

not sufficient for the non-moving party to merely "'show that there is some metaphysical doubt

as to the material facts.'"  *Id., quoting Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish

that it is bereft of a genuine issue of material fact."  *Id.* at 1479-80.  That is, the non-moving

party has an affirmative duty to direct the court's attention to those specific portions of the record

upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654,

665 (6th Cir. 2001).

### III.  DISCUSSION

Plaintiff asserts two Title VII claims: (1) sexual harassment and (2) retaliation for

11

engaging in conduct protected by Title VII, namely, complaining about the alleged sexual

harassment.  Defendant moves for summary judgment on both Title VII claims.  The Court will

address both claims in turn.

**A.      Sexual Harassment**

Plaintiff alleges two theories of sexual harassment, (1) *quid pro quo* and (2) hostile work

environment. (Complaint, Counts 1 and 2; Pl.'s Memo. in Opp. at 9-16).  Defendant argues that

Plaintiff's *quid pro quo* claim fails because Plaintiff suffered no tangible employment action.

(Def.'s Mot. for Summ. J. at 15).  This Court agrees.  Defendant further argues that it is entitled

to summary judgment on Plaintiff's hostile work environment claim because (1) Mr. Hutter's

conduct was not severe and pervasive; and (2) ODJFS is not liable pursuant to the

*Faragher/Ellerth* affirmative defense. (Def.'s Mot. for Summ. J. at 21-30).  This Court disagrees

that Mr. Hutter's alleged conduct was not severe and pervasive as a matter of law, though the

Court finds that summary judgment is appropriate because ODJFS has a meritorious

affirmative defense.

**1.      Sexual Harassment - *Quid Pro Quo***

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating

"against  any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42

U.S.C. § 2000e-2(A)(1).  "Cases based on carried-out threats are referred to as *quid pro quo*

cases, as distinct from bothersome attentions or sexual remarks sufficient to create a hostile work

environment." *Burlington v. Ellerth*, 524 U.S. 742, 751 (1998).  In *Ellerth*, the Court explained

that the "principal significance of the distinction" made in *Meritor Savings Bank, FSB v. Vinson*,

477 U.S. 57 (1986), between *quid pro quo* and hostile work environment claims is to explain that

the latter must be severe or pervasive. *Id*. at 752.  The Court further explained:

> When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.

*Id*. at 753-754.

The Court described a "tangible employment action" as "a significant change in employment status, such as discharge, demotion, or undesirable reassignment." *Id*. at 744.

In the instant case, Plaintiff claims she "suffered a tangible job detriment as a result of being transferred to an undesirable position." (Compl. ¶ 22).  There is no evidence, however, that Mr. Hutter was involved in the decision to grant Plaintiff's reassignment. (*See* Demidovich Aff.). Instead, the evidence shows it was a prompt and reasonable response by management to separate Plaintiff and the alleged harasser, especially given Plaintiff's prior requests for a reassignment. That Plaintiff claims the position is "undesirable" does not change the fact that she has failed to establish the requisite causal link between the reassignment, the alleged harassment, and Mr. Hutter. *See e.g.*, *Lee-Crespo v. Schering-Plough Del Caribe Inc.,* 354 F.3d 34, 44-45 (1st Cir. 2003) (holding that a plaintiff must establish a causal link between the alleged tangible employment action, the alleged harassment, and the alleged supervisor-harasser).

In her opposition brief, Plaintiff also argues that Mr. Hutter's "making of unlawful threats of discipline against her," his "physical assault," and his "unfair and discriminatory treatment [of Plaintiff]," constitute tangible employment actions.

Unfulfilled threats do not constitute tangible employment actions. *Ellerth,* 524 U.S. at 754.  The physical assault did not change her employment status or reduce her job benefits. Likewise, the unfair treatment referenced by Plaintiff, including Mr. Hutter's alleged refusal to

13

allow Plaintiff to "Flex" or to travel to certain meetings and his "scrutinizing" of Plaintiff's time

worked, did not amount to a significant change in her employment status or a reduction in her

job benefits. Accordingly, Plaintiff's *quid pro quo* claim fails because she has failed to raise a

genuine issue that she suffered a tangible employment action. As set forth in *Ellerth*, where the

plaintiff's "claim involves only unfulfilled threats, it should be categorized as a hostile work

environment claim which requires a showing of severe or pervasive conduct.

## 2. Sexual Harassment - Hostile Environment

Plaintiff alleges that she was subject to a sexually hostile work environment while

working at ODJFS. (Compl. ¶¶ 24-28).

To establish a claim under Title VII for hostile work environment based upon sexual

harassment, a plaintiff must demonstrate that (1) she is a member of a protected class, (2) she

was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the

charged sexual harassment unreasonably interfered with plaintiff's work performance and created

a hostile or offensive work environment that was severe and pervasive, and (5) the employer

knew or should have known of the charged harassment and unreasonably failed to take prompt

and appropriate corrective action. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Fenton

v. HiSAN, Inc.*, 174 F.3d 827, 829-30 (6th Cir. 1999); *Blankenship v. Parke Care Ctrs., Inc.*, 123

F.3d 868, 872 (6th Cir.1997). A hostile work environment occurs "[w]hen the workplace is

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and

citations omitted). Both an objective and a subjective test must be applied: the conduct must

have been severe or pervasive enough to create an environment that a reasonable person would

find hostile or abusive, and the victim must subjectively regard that environment as having been abusive. *Id.* at 21-22. Isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000). Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment include:

1.  the frequency of the discriminatory conduct;

2.  the severity of the discriminatory conduct;

3.  whether the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance;

4.  whether the discriminatory conduct interferes with an employee's work performance; and

5.  whether the plaintiff actually found the environment abusive.

*Harris,* 510 U.S. at 21-22; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (reciting factors from *Harris*). The Supreme Court has explained:

> Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale*, 523 U.S., at 81. A recurring point in these opinions is that "simple teasing," *id.*, at 82, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment." These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." *Id.*, at 80. Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." B. Lindemann & D. Kadue, *Sexual Harassment in Employment Law* 175 (1992) (hereinafter Lindemann & Kadue) (footnotes omitted). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing*

15

*Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

  Defendant argues that Plaintiff has failed to show that Mr. Hutter's conduct was sufficiently severe and pervasive. (Def.'s Mot. for Summ. J. at 21-22).  Additionally, Defendant asserts that it is not liable because it has an affirmative defense. (Def.'s Mot. for Summ. J. at 25).  The Court considers Defendant's arguments in turn.

        **a.**        **Severe and Pervasive**

Defendant, to support its contention that Mr. Hutter's conduct was not sufficiently severe and pervasive, correctly points out that the Court must consider the "totality of the circumstances." (*See* Def.'s Mot. for Summ. J. at 21).  Defendant does not, however, properly apply the law to the present case.  Instead, Defendant has improperly considered incidents in isolation, and lumped similar incidents together, subsequently dismissing them as not severe or pervasive.

For example, Defendant lumped Mr. Hutter's alleged conduct from the three separate car rides together and concluded "While these incidents may have been inappropriate . . . three isolated incidents during a six month period is not sufficiently severe or pervasive."  (Def.'s Mot. for Summ. J. at 21-22).  Defendant then lumped all the alleged stares and comments Mr. Hutter made to Plaintiff throughout her entire employment regarding her appearance, and concluded it was only "an average of once every ten days," and such comments and stares were "innocuous." (Def.'s Mot. for Summ. J. at 23).  Next, Defendant lumped together all of Mr. Hutter's alleged physical contact of Plaintiff throughout her entire employment, such as rubbing up against

Plaintiff, moving her around, holding her hand too long, and patting her on the buttocks. *Id*. With the exception of the alleged patting of Plaintiff's buttocks, Defendant described the physical contact as "accidental normal physical contacts which occur in virtually all workplaces." *Id*. As for the pattings of Plaintiff's buttocks, Defendant asserted, "Three pats within a six month period without more is not pervasive enough . . . ." *Id*. Finally, Defendant improperly considered the February 2005 incident – in which Mr. Hutter allegedly pushed Plaintiff up against a wall while touching her breast, waist, and buttocks – in isolation. Defendant argued that the incident, "assuming it occurred, could be considered serious and offensive, but not severe and pervasive." *Id*. at 24.

But the Court **does not consider alleged incidents in isolation. Instead, the Court considers the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive. As required by** *Harris***, this Court's analysis must be made from both an objective and subjective perspective.** *Harris***, 510 U.S. at 21-21. It is clear from Plaintiff's testimony regarding her psychological state, and her actions following the February 2005 assault, that Plaintiff subjectively regarded her environment as abusive. Further, the Court finds that when the evidence is viewed in the light most favorable to Plaintiff, a reasonable jury could find that Mr. Hutter's conduct was severe and pervasive enough to alter the conditions of employment and create an abusive work environment.** *See Jordan v. City of Cleveland***, 464 F.3d 584, 597-598 (6th Cir. 2006) (noting "[w]hether conduct is**

17

severe or pervasive is 'quintessentially a question of fact'" and finding that "a reasonable jury could find that the factors taken together . . . were sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and to create an abusive work environment" (citations omitted)).      Based upon this finding, the Court must now determine whether Defendant has an affirmative defense to Plaintiff's sexual harassment hostile work environment claim.

**b.**     **Affirmative Defense**

Defendant ODJFS asserts that it is not liable for the alleged harassment because it satisfied both prongs of the *Faragher/Ellerth* defense. (Def.'s Mot. for Summ. J. at 25; Reply at 4).  The Court agrees.

In *Faragher* and *Ellerth*, the U.S. Supreme Court held, "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 777-778.  To establish the defense, the defending employer must prove two necessary elements:

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 778.

**i.**     **Reasonable Care to Prevent and Correct Sexual Harassment**

The Sixth Circuit has ruled that employers have an affirmative duty to prevent sexual harassment by supervisors. *Clark v. United Parcel Service, Inc.,* 400 F.3d 341, 349 (6th Cir. 2005). This requires employers to implement some sort of sexual harassment policy that is effective in practice and reasonable in preventing and correcting any harassing behavior. *Id.* The *Clark* Court provided guidance for evaluating sexual harassment policies:

> While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment, *see Varner v. Nat'l Super Markets, Inc.,* 94 F.3d 1209, 1214 (8th Cir.1996); (2) permit both informal and formal complaints of harassment to be made, *Wilson v. Tulsa Junior Coll.,* 164 F.3d 534, 541 (10th Cir.1998); (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, *Faragher,* 524 U.S. at 808, 118 S.Ct. 2275; and (4) and provide for training regarding the policy, *Wilson,* 164 F.3d at 541.

*Id.* at 349-350.

In the instant case, ODJFS had in place a sexual harassment policy that clearly provides for the prevention and correction of sexual harassment in the workplace. It specifically prohibits sexually offensive conduct, requires all managers to report information concerning discriminatory behavior, and instructs employees how to file both formal complaints and informal grievances. The sexual harassment is accessible on ODJFS's internet website at any time. All employees are trained on the policy, how to report sexual harassment, and where to find the policy. (*See* Demidovich Aff.). Further, ODJFS employs its own in-house division, the Bureau of Civil Rights, which is specifically responsible for the investigation and correction of discrimination in the workplace, including sexual harassment. Finally, all employees have the ability, through a telephone call, to report instances of harassment to someone other than their supervisors who may be the alleged offenders. (*See* Demidovich Aff.).

Plaintiff admits that she received the policy and that she was trained in orientation

19

regarding the policy. (Allen Depo. at 36-37; Demidovich Aff.).  Indeed, Plaintiff actually contacted the Bureau on several occasions during her employment to complain about other forms of discrimination.

Based upon the foregoing, the Court finds that Defendant ODJFS had taken reasonable care to prevent sexual harassment.

The Court also finds that Defendant ODJFS took reasonable care to correct the alleged sexual harassment.  Upon Plaintiff's February 2005 report, Defendant, within twenty-four hours, transferred Plaintiff into a lateral position outside Mr. Hutter's line of supervision and located on a different floor.  In addition, the ODJFS Bureau of Civil Rights conducted a full investigation into Plaintiff's allegations against Mr. Hutter.  The Court finds that Defendant's prompt response in separating the alleged harasser and harassee, and in conducting a complete investigation, was reasonably calculated to correct and prevent further harassment.


### ii.     Unreasonable Failure to Take Advantage of Preventative or Corrective Opportunities

Plaintiff does not deny that she received ODJFS's harassment policy, or that she was trained to file a complaint with ODJFS's Bureau of Civil Rights if she experienced harassment. In fact, Plaintiff's documented history of filing discrimination and harassment complaints shows her knowledge of Defendant ODJFS's policies and procedures.  Plaintiff, however, did not follow her training and report the alleged harassment until February 16, 2005.

To counter Defendant's assertion that Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities, Plaintiff claims that she told Mr. Clayborn that "she was uncomfortable riding with Mr. Hutter," and that "[a] reasonable person under the circumstances

20

would have inquired into the reason for the Plaintiff's uncomfortable feelings and learned that she was being subjected to sexual harassment." (Pl.'s Memo. in Opp. at 15).

Plaintiff's statements in her Memorandum in Opposition run counter to her deposition testimony wherein she stated that Mr. Clayborn did in fact inquire into what happened to make her feel uncomfortable. (Allen Depo. at 110).  She admitted that she did not tell Mr. Clayborn that she was being sexually harassed, and further stated that she "didn't tell anybody, except one cousin." (Allen Depo. at 218).

Plaintiff's one comment that she felt "uncomfortable" is not enough to establish that Defendant had constructive notice of the harassment prior to February 16, 2005, especially where there is no mention of sexually offensive behavior. *See e.g.*, *Kunin v. Sears Roebuck and Co.,* 175 F.3d 289, 294 (2nd Cir. 1995).  There are numerous reasons that Plaintiff could have been uncomfortable with Mr. Hutter, including the fact that he was a supervisor.  Plaintiff does not claim that the alleged harassment was open and obvious; indeed, she's produced no witnesses to the alleged harassment.  Accordingly, prior to February 16, 2005, the Court finds that Defendant did not have constructive notice of the alleged harassment.

Upon Plaintiff's February 16, 2005 report of the alleged assault, Defendant promptly took corrective action by launching an investigation and separating Plaintiff and Mr. Hutter, transferring Plaintiff to a lateral position out of Mr. Hutter's line of supervision and on another floor.  Defendant argues that Plaintiff unreasonably failed to avail herself fo the corrective measures by refusing to return to work in her new position.  (Def.'s Mot. for Summ. J. at 29). This Court agrees.

*Collette v. Stein-Mart*, *Inc.*, 126 Fed. Appx. 678 (6th Cir. 2005) is instructive.  In *Collette*, a female employee was assaulted by her supervisor during an after-work party and, even though

the supervisor was removed, the employee refused to return to work.  *Id*. at 679-680.  The Court upheld summary judgment for the employer, based in part upon the Court's finding that the employer had satisfied the second prong of the *Ellerth-Faragher* affirmative defense.  The Court explained, "[Plaintiff] failed to avail herself of the ultimate corrective opportunity: returning to work with the harasser permanently out of the picture." *Id*. at 686.

In the present case, Plaintiff, like the *Collette* plaintiff, "failed to avail herself of the ultimate corrective opportunity" in refusing to return to work after Defendant had separated her and Mr. Hutter.  Consequently, this Court finds that Defendant has satisfied the second prong of the *Ellerth-Faragher* defense.

Accordingly, Defendant, having satisfied both of the necessary elements, has a meritorious *Ellerth-Faragher* defense to Plaintiff's sexual harassment hostile environment claim.


**B.**    **Retaliation.**

Defendant ODJFS argues that Plaintiff cannot establish a *prima facie* case of retaliation because she cannot state an adverse employment action. This Court agrees.

Title VII prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendant knew of this exercise of her protected rights; (3) the defendant consequently took an action that was "materially adverse" to the plaintiff; and (4) there is a causal connection between the protected activity and the materially adverse action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003); *see also Burlington Northern and*

22

*Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action"). A plaintiff may satisfy the participation element of a *prima facie* case for retaliation by showing he reasonably believed his activity was protected. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to come forward with a legitimate, non-discriminatory and non-retaliatory reason for the adverse action against the plaintiff. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). If the defendant comes forward with a legitimate, non-discriminatory and non-retaliatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination or retaliation. *Hicks*, 509 U.S. at 512 n. 4; *Burdine,* 450 U.S. at 253. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." *Burdine* at 253.

The only element of the *prima facie* case in dispute is whether or not Plaintiff's reassignment was materially adverse.

The U.S. Supreme Court, in *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006), resolved a long standing split in the circuits over the appropriate standard for Title VII's anti-retaliation provision, which prohibits an employer from discriminating against an employee because that employee has engaged activity protected by Title VII. Prior to

*Burlington Northern*, many circuit courts, including the Sixth Circuit, applied the same standard for retaliation that they applied to a substantive discrimination offense when defining the "level of seriousness to which harm must rise before it becomes actionable retaliation." *Id*. at 2410; 2414.

In *Burlington Northern*, the Court recognized that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," and thus the provisions "are not coterminous" *Id.* at 2412-2414.  The Court rejected the Sixth Circuit's requirement that a Title VII plaintiff claiming retaliation demonstrate an adverse "employment" action.  Instead, the Court adopted the less stringent standard utilized by Seventh and District of Columbia Circuits:

> In our view, a plaintiff must show that a reasonable employee would not have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Id*. at 2415 (*quoting Rochon v. Gonzales*, 438 F.3d 1211, (D.C. Cir. 2006) (*quoting Washington v. Illinois Dept. of Revenue*, 420 F.3d 658, (7th Cir. 2005)).

In the present case, the Court finds that Plaintiff's reassignment was not materially adverse even under the less stringent *Burlington Northern* standard, especially since Plaintiff had been requesting a transfer.  Looking to Seventh Circuit precedent, as the *Burlington Northern* Court did in defining adverse employment actions under Title VII retaliation claims, transfers without any reduction in pay or status are not typically adverse employment actions. *Herron v. DaimlerChrysler Corp*., 388 F.3d 297, 301 (7th Cir. 2004) (*citing Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2004) ("Job transfers . . . that lead to significantly diminished

responsibilities and substantially changed working conditions can be retaliatory actions."). *See also Burlington Northern*, 126 S.Ct. at 2415 ("We agree with the formulation set forth by the Seventh and the District of Columbia Circuits.").

Plaintiff admits that the new position was a lateral one and carried the same salary and benefits.  In addition, the new position was in the same classification and collective bargaining unit, was within the same division, and had similar job duties.  Moreover, when asked about her prior statement that the duties of the new job would be "diminished," Plaintiff admitted, "It's not that the duties themselves would have been diminished for someone who was interested in doing that." (Allen Depo. at 249).

Despite these admissions, Plaintiff argues that the new position was "undesirable" for the following reasons: (1) she wanted to be reassigned to a position located in another building (Allen Depo. at 248-249); (2) she was not interested in performing the new duties (Allen Depo. at 249); (3) the job responsibilities were not challenging enough (*Id.*); and (4) she was going to "lose out" on her friendships (Allen Depo. at 249-250).

These complaints and desires are subjective, and the "standard for judging harm must be objective." *Burlington Northern*, 126 S.Ct. at 2415.  The *Burlington Northern* Court explained the necessity for an objective standard: "It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id*.  Applying an objective standard, the Court finds that nothing about Plaintiff's reassignment would dissuade a reasonable worker from making or supporting a charge of discrimination, especially where that worker had previously requested a transfer.          Accordingly, this Court concludes, as a matter of law, that Plaintiff's lateral reassignment does not constitute a materially adverse action,

25

especially in light of Plaintiff's prior requests for a transfer.  Because Plaintiff cannot establish a *prima facie* case of retaliation, Defendant ODJFS is entitled to summary judgment.

## IV.  CONCLUSION

For all of the foregoing reasons, the Court **GRANTS** Defendant ODJFS's Motion for Summary Judgment (Doc. 17).

The Clerk shall remove this case from the Court's pending cases list.

The Clerk shall remove Document 17 from the Court's pending motions list.

**IT IS SO ORDERED.**


 **/s/ George C. Smith**_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**